EBENEZER D. HARRIS, JR., ET AL., APPELLEES, V. LINCOLN & NORTHWESTERN RAILWAY COMPANY ET AL., APPELLANTS.

FILED SEPTEMBER 28, 1912.   No. 16,646.

1. **Eminent Domain**: RAILROADS: DAMAGES. The measure of damages for permanent injury to land occasioned by the necessary and proper construction of a railroad, no part of the land having been taken, is the difference in the market value of the property immediately before and immediately after the construction of the improvement, unaffected by any increase or depreciation of values generally in the same vicinity.

2. **Appeal**: ADMISSION OF EVIDENCE. In such case, the reception of evidence of the fair and reasonable value of the land immediately before and immediately after the overflow is reversible error.

3. **Waters**: FLOODING LAND: ACTION FOR DAMAGES: BURDEN OF PROOF. In an action for damages to land and growing crops by floodwaters of a stream, subject to overflow from natural causes, and which it is alleged were thrown upon the plaintiffs' land by the negligent and improper construction of a railroad nearby and adjacent thereto, the burden of proof is on the plaintiffs to show that the construction complained of either caused such overflow or increased the same, or in some manner contributed thereto, together with the nature and extent of the increased overflow, if any, and the amount of damages caused thereby.

4. **Evidence** examined, and found insufficient to sustain the verdict.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE.  *Reversed.*

*James E. Kelby, Halleck F. Rose* and *Byron Clark,* for appellants.

*A. G. Wolfenbarger* and *George W. Berge, contra.*

BARNES, J.

Action for damages alleged to have been sustained by plaintiffs, by reason of the construction of that part of defendants' railroad near the city of Lincoln, known as the "Denton cut-off," which, it is alleged, caused the waters of Middle creek to flow over, across and upon the plaintiffs' land, destroying the crops growing thereon, and permanently injuring the land itself.

It was alleged in the plaintiffs' petition that the defendants in constructing their line of railroad established and made dikes and dams, and negligently, carelessly and recklessly filled and dammed up the natural watercourse and channel of Middle creek, entirely changing the natural bed and channel of that stream, causing its waters to be turned aside from the bed channel and natural course in which they had run from time immemorial, and carelessly, recklessly and unnecessarily cut and caused to be constructed a new and entirely different outlet and channel to carry the waters of the stream, beginning with the point of diversion at about one-half a mile above and northwest of the land owned and farmed by plaintiffs, thereby causing their land to be subject to overflow.  It was further alleged in the petition that "before the building, establishing and construction of the grades, embankments, trackage, dikes and dams, and the diversion of the waters of said stream, the said land of the plaintiffs was worth, at a fair and reasonable valuation, the sum of $200 per acre; but on account of said negligent, careless, reckless and unnecessary acts and doings of the said defend-

ants, the said land is now rendered subject to continued and permanent danger of overflow, and the salable, reasonable and true market value of the same has been reduced more than $100 per acre, and said injury and damage to said land is permanent; that plaintiffs suffered damage in the premises by reason of said injury to and depreciation of the value of said land in the sum of $6,000, and all on account of the negligence, carelessness and unnecessary acts and doings of said defendants;" that on or about the 10th day of June, 1907, the watershed drained by Middle creek, including the vicinity where plaintiffs' land is situated, was visited by a heavy rain, and the volume of water coming down the stream was obstructed, caused to back up, and could not find its natural and proper outlet, and, because of the dams, high grades, embankments and other obstructions, Middle creek was caused to overflow and flood the land and farm of the plaintiffs, washing and tearing out their crops, and covering the land with loose earth, soil, washings, silt, sand, gravel, wreckage and debris, destroying their growing crops, to their damage in the sum of $4,000, and permanently injuring and damaging the land itself in the further sum of $5,100, for all of which they prayed judgment.

Defendants by their answer denied the allegations of the petition, both generally and specifically, and alleged that the natural bed and channel of Middle creek passes through plaintiffs' land, and then was, and now is, unobstructed; that the lands comprising the entire valley of the said stream, from its source to its mouth, including the land described in plaintiffs' petition, have from wholly natural causes, from time immemorial, and long anterior to any railroad or other improvements therein, been subject to overflow; that any overflow of water thereon at the time stated in the petition was due wholly to natural causes and to excessive and extraordinary rainfalls in the area of the land drained by that stream beyond any that had been previously known therein, and which so swelled the stream that it overflowed its banks, and the overflow was

caused by the act of God; that the defendants and neither of them were responsible or answerable therefor. It was also alleged that the petition stated two causes of action which were improperly joined, and the defendants prayed that the plaintiffs be required, before trial, to elect upon which of said causes they would rely. The reply was a general denial. The court refused to require the plaintiffs to elect. The cause was tried to a jury, the trial resulted in a verdict for the plaintiffs for $1,200, permanent injury to their land, exclusive of the damages sustained to their growing crops, and damages to crops to the amount of $1,839. A motion for a new trial was overruled; judgment was rendered on the verdict for the sum of $3,039, and the defendants have brought the case here by appeal.

One of the grounds assigned for a reversal is that the evidence is insufficient to sustain the judgment. It must be conceded that the burden of proof was on the plaintiffs to show by a preponderance of the evidence that the new construction, of which they complain, either caused the flood of June 10, 1907, to overflow their premises, or in some manner increased the natural overflow, together with the extent of such increase and the amount of their damages caused thereby.

It was disclosed by the plaintiffs' evidence that they were not the fee-title owners of the land described in their petition, but were in possession and were occupying it as lessees from the state, which was the owner of the fee; that they were paying therefor a rental of $19.60 a year, payable semi-annually; that they procured their leasehold interest in the month of September, 1906, and took possession of the land some time thereafter; that by the spring of 1907 they had completed their improvements in the way of a dwelling-house, stables and outhouses, which were located upon or near the southeast corner of the forty-acre tract, at a place which was above the floodwaters; that when they took possession of the land it was an ordinary pasture, situated in the lowest part of the valley of Middle creek, with that stream running through

it in a winding course, cutting it into three parts; that they broke a part of the land, harrowed it, disced it, and planted it to different kinds of marketable garden vegetables; that their crop was in fair condition when the flood in question occurred. It appears that on the 10th day of June there was an unusually heavy and excessive rainfall over all of the watershed drained by Middle creek, which caused the stream to overflow its banks. The overflow commenced about 8 o'clock in the morning, reached its highest point about noon, or shortly thereafter, and receded so that the creek was again within its banks by 4 or 5 o'clock in the afternoon; that the flood-waters swept over plaintiffs' land in the general direction of the course of the stream, and washed out and partially destroyed their crops.

The record shows that when the flood was at its highest point all of the plaintiffs' land, except about 11 acres, was covered by water. The ground where plaintiffs' permanent improvements were situated was not flooded and the remainder of the land which was not covered by water was situated on the north side of Middle creek, between that stream and the new construction. The evidence discloses that a change was made in the channel of Middle creek at a point about half a mile north and west of the plaintiffs' premises, which, it was alleged, caused the stream to flow in a southeasterly direction, whereas it formerly flowed to the north and east, and thereby forced the flood-waters onto plaintiffs' land, and caused the overflow in question.

It appears, without dispute, that when the new line was constructed it crossed a bend or loop in the stream on the north side of the valley, and, in order to save building two bridges, a channel was cut on the south side of the new construction, and the bend or the old channel was filled up. The new channel was 600 feet long, and had sufficient carrying capacity to accommodate any ordinary flow of the stream. Before the cut-off was made the stream ran to the north from the point of diversion,

made a short turn, ran back to the south, and continued its course down the valley and through the plaintiffs' premises precisely the same as since the new construction. The cut-off merely shortened the stream at that point some 600 feet, and its only effect was to slightly accelerate its flow. It is claimed, however, that before this cut-off was made the flood-waters of Middle creek at that point overflowed its bank, were diverted to the north and northeast, and thus relieved the valley of a portion of the overflow; that by the new construction and the new channel the flood-waters of the creek were turned to the south and thrown upon the plaintiffs' premises. As we view the record, that contention was not sustained by the evidence. Engineer Scott, who was a witness for the plaintiffs, testified; and the topographical map made by him, which is found in the bill of exceptions, clearly shows that at the north and east bank of the creek, where it turned south, and where it is claimed relief would have been had from the flood-waters but for the new construction, the elevation is 85.3, while at the highest point on plaintiffs' land, north of the creek, the elevation is only 83.4. So, it clearly appears that the flood-waters could not have escaped to the north and east at the point of diversion without attaining a level which would have entirely flooded the plaintiffs' premises.

It was also shown, without dispute, that on the south side of the new construction a wide and deep borrow-pit was constructed from the east end of the new channel to Salt creek; and it appears from a topographical map showing the extent of the flood-waters in question, the correctness of which is not challenged, that, when the flood was at its highest point, water ran down this borrow-pit, and at that time there was quite a large tract of plaintiffs' land on the north side of the creek, and between it and the new construction, which was not covered by water.

It further appears that plaintiff, when asked in what direction the water of Middle creek would flow when it

got above the banks at his place, answered: "It would have a tendency to flow towards Lincoln here, from up there (indicating east). Q. Towards the east? A. Yes, sir; the overflow; the general movement of the water was eastward."

S. M. Bartlett, one of the plaintiffs' witnesses, who had lived many years in the valley, testified that before the new construction, when Middle creek got out of its banks, it spread out all over the bottoms; that it spread north, and that it would flow east; the general direction of its course was east. This witness also testified that from his experience before 1906 when the new Milford cut-off was constructed, his lands situated in the valley, and near the 40 acres belonging to the plaintiffs, overflowed entirely independent of the grades; that in the flood of 1907 there was an island north of Mr. Harris' place, between that and the new railroad grade.

Peter Judge, a witness for the plaintiffs, testified that he had often seen Middle creek overflow its banks; that it was subject to frequent overflows; that, before the high land would overflow between plaintiffs' place and the railroad, their land would be under water. Another witness for the plaintiffs testified that north of Harris' house, after you cross the creek to go towards the railroad grade, there are some high places there that would throw the water south into the creek. A. G. Harris testified that the water, after leaving Cushman Park, which is above plaintiffs' premises, would spread out over the low land to a great extent across the valley.

For the defendant, E. M. Westervelt testified that, within a few years before 1907, the old Milford line at Cushman Park, and between Cushman Park and Lincoln, was washed out by overflows, and the valley was covered with water from one side to the other. Another witness testified that, when the water reached plaintiffs' land, it had a tendency to turn and flow southward along the course of the creek.

So it seems clear that the plaintiffs' claim that the new

construction either caused or contributed to the overflow, of which they complain, is not sustained by the evidence, but rests upon assumption or conjecture. In *Treichel v. Great Northern R. Co.*, 80 Minn. 96, it was said: "Damages cannot be predicated upon conjecture or mere speculation." It would seem clear that in this case, to sustain a recovery, the plaintiffs must show the excess of the overflow, which was caused by the acts complained of, over that which would have resulted from natural causes, and the extent of the damages caused thereby, and upon this point the record contains no direct or competent evidence.

It was also alleged that the defendants had constructed a dike across the north part of the valley, at or near what is called the "Denton cut-off bridge," which prevented any of the flood-waters of the stream from passing down the valley on the north side of the new construction; but the evidence shows that this dike was not constructed until the year 1908, and could not have in any way contributed to the flood of June 10, 1907.

Another ground assigned by the defendants for a reversal of the judgment is that the court erred in receiving evidence as to the measure of the plaintiffs' damages for permanent injuries to their land. It appears that the plaintiffs, in order to maintain their action for such injuries, propounded certain questions to their witnesses, and received answers thereto, in substance, as follows: Q. What was the fair and reasonable value of the plaintiffs' 40-acre tract of land on June 10, 1907, just before the flood of that date? A. $200 an acre. Q. What was the fair and reasonable value of that land immediately after the flood, which occurred on June 10, 1907? A. Not over $50 or $60 an acre. To this evidence defendants strenuously objected. Their objections were overruled, and the testimony was allowed to go to the jury.

It appears that when plaintiffs took the assignment of their lease in September, 1906, defendants had commenced and partially completed their yards and the new Milford

or Denton cut-off, of which complaint is made. Now, if it be conceded that the plaintiffs were entitled to recover for permanent damages to the land itself, as claimed by their petition, the inquiry should have been directed to the fair and reasonable market value of the land at the time when the new line of road was constructed, and its fair and reasonable market value immediately after the completion thereof. *Omaha Belt R. Co. v. McDermott*, 25 Neb. 714; *Blakeley v. Chicago, K. & N. R. Co.*, 25 Neb. 207; *City of Harvard v. Crouch*, 47 Neb. 133; *Chicago, R. I. & P. R. Co. v. Sturey*, 55 Neb. 137.

Plaintiffs contend, however, that because the new construction was situated about 40 rods north of their land, and no part of the land was taken, the rule announced in the foregoing cases does not apply; that they were entitled to recover damages for permanent injury to their land whenever and as often as it should be flooded by the waters of Middle creek, and that the evidence of values should be confined to that date. This contention might be sustained if it were shown that the defendants had unnecessarily and improperly constructed their railroad; that such construction caused or contributed to the overflow, and the extent of the increase thereof, if any. Upon that question, however, we are of opinion that the evidence found in the record does not furnish a sufficient basis for a recovery.

Defendants' brief contains several other assignments, but the foregoing conclusions render their determination unnecessary.

For the reasons above stated, the judgment of the district court is reversed and the cause is remanded for further proceedings.

REVERSED.

REESE, C. J., not sitting.

SEDGWICK, J., concurs in the result reversing the judgment.

LETTON, J., concurring in part, and dissenting in part.

I agree with the conclusion that the plaintiffs are not entitled to recover for the alleged permanent injury to the land in question, upon the ground that they are not the owners of the fee and were not at the time of the overflow, and that for that reason the judgment should be reversed, at least, in part.   Doubtless for prudential reasons, the cause was submitted to the jury in two separate parts; one, to find the extent of the injury to the land, and the other, to find the amount of damages suffered by the injury to and destruction of the growing crops.   The jury found that the damage to the land amounted to $1,200, and to the growing crops, $1,839.   The land was used for market gardening, and the various crops growing thereon were of great value, and that growing on the greater part was wholly destroyed.   If the embankment constructed by defendants was negligently made and was the cause of the overflow, there can be no doubt of plaintiffs' right to recover to the extent of the injury to the growing crops, and the fact that the jury made a finding as to the extent of that damage, separate from the injury to the land, would permit the judgment to be affirmed for $1,839.   This being true, the questions as to the proper construction of the embankment and as to the cause of the increased overflow became largely questions of fact to be solved by the trial jury.   It is conceded that the valley of Middle creek was subject to occasional overflows, and at such times the water spread out over the valley to a greater or less depth, but at no time to the depth attained on the occasion named, and with such injurious effects as in the instance referred to in this record. There is evidence that the water was forced upon plaintiffs' possessions to such an extent as not only to destroy the growing gardens, but to remove the soil in places and deposit it in others, thereby destroying all and rendering the ground in no condition for replanting or resetting.

There is also evidence that the construction of the em-

bankment, which extended from a distance above plaintiffs' field to far below it, without any opening or other provision whereby the flood-waters could spread out over the valley as upon previous occasions, had the effect of forcing all the flood upon the one side of the valley where plaintiffs' land is located, and greatly increased the volume and destructiveness of the flow. I think this evidence was sufficient to justify the submission of these facts to the jury, and with their finding thereon we should be content.

It is my opinion that the judgment should be affirmed for the $1,839, upon condition that plaintiffs remit the $1,200 as of date of the judgment, and that the costs of the appeal be taxed to them.