WILLIAM ALBERS, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT.

FILED MARCH 13, 1914.   No. 17,592.

1. **Waters: DAMAGES: RAILROAD EMBANKMENTS: DIRECTING VERDICT.** Action to recover damages alleged to have been sustained by the negligent construction of defendant's railroad yards and grades, which, it is claimed, held back the flood waters of Salt creek, and threw them over plaintiff's premises and into his store building. It appears from plaintiff's evidence that, when the water reached its maximum height, the defendant's tracks and grades were entirely submerged; that the water formed a lake in the salt basin of such depth as to stand three feet deep in plaintiff's store for several hours. *Held,* That defendant's motion to direct a verdict in its favor should have been sustained.

2. **New Trial: FINDINGS: EVIDENCE.** Special findings of the jury are ordinarily entitled to great weight, and will not be lightly set aside, but where there is no evidence to sustain them they are not controlling, and a new trial should be awarded.

3. **Venue:** MOTION FOR CHANGE: REVIEW. Where the evidence submitted in support of a motion for a change of venue fairly shows that the party seeking such change cannot have a fair and impartial trial in the county where the action is pending, it is reversible error to overrule the motion.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Reversed.*

*Jesse L. Root, Byron Clark, E. C. Strode, Max V. Beghtol* and *Barton L. Green,* for appellant.

*Wilmer B. Comstock, contra.*

BARNES, J.

This was an action to recover damages sustained by plaintiff by the partial destruction of his stock of groceries contained in his store building at the corner of Fifth and D streets, on lots 11 and 12, in block 194, of the city of Lincoln,. together with damages to the lot and building, caused by the flood waters of July 6, 1908, which, it was alleged, had been thrown upon plaintiff's premises by the negligent construction of the new yards, tracks and grades of the defendant railroad.

The answer admitted the construction of the grades, embankments, bridges and culverts over and across what is known as the Salt basin, west of the city of Lincoln, in Lancaster county, north of the place where the channels of Salt and Middle creeks enter said basin; and alleged that the lots and. personal property described in plaintiff's petition were located in low ground which was subject to inundations and overflow, and known to be subject thereto from the earliest known history of the basin, and at a point where the surface and channel waters of the surrounding country were precipitated down steep grades into said basin; that when said basin was filled the waters thereof would spread out, overflow, extend to and include the lands of which plaintiff's lots formed a part; that on the 6th day of July, 1908, the waters accumulated from the drainage area into said valleys and basin and stood back upon plaintiff's lots, as, by the nat-

ural topography of the valleys in said basin, it was compelled to do; that said waters were the result of an excessive rainfall, theretofore unknown and unequaled in quantity in the same period of time in said valleys and basin, the drainage area thereof and the tributaries thereto, and one which the defendant could not, nor was it required by law to, provide for; that defendant's grades, embankments, culverts and bridges were built in a skilful manner for drainage and railroad purposes, and included in such construction the plans, bridges, culverts and waterways equal to that which nature provided for known, natural, usual and ordinary drainage purposes; that said rainfall was of such unusual volume that it submerged defendant's embankments and railroad tracks, and the depth of water complained of was the result of natural conditions; that any damages of which plaintiff complains and which accrued therefrom were not contributed to by any act of the defendant, nor influenced by defendant's grades, embankments, tracks, bridges or culverts. Defendant denied each and every other allegation contained in plaintiff's petition. Plaintiff's reply was a general denial of the allegations of the answer.

Upon the issues thus joined, there was a trial to a jury, and a verdict was returned for the plaintiff for the sum of $1,000. Two special findings were also submitted to the jury, which, with the answers thereto, read as follows: "First. Would the plaintiff's real estate described in his petition have been damaged to any extent by the flood waters of July 6, 1908, had the defendant's embankments not have been constructed in the Salt creek valley? Answer: No. Second. Would any part of the plaintiff's personal property described in his petition have been damaged by the flood waters of July 6, 1908, had the defendant's embankments not have been constructed in the Salt creek valley? Answer: No."

A motion for a new trial was overruled, judgment was rendered on the verdict, and the defendant has brought the case to this court by an appeal.

Defendant, among other assignments of error, contends that the verdict is not sustained by the evidence. It appears from the record that plaintiff gave evidence of the extent and value of the stock of groceries damaged and destroyed by the flood, and the depreciation in the value of his land and buildings caused thereby. He testified that the flood waters began to flow over his premises about 6 o'clock on the morning of the 6th of July, 1908, and that the water increased in height and depth until about 8 or 9 o'clock, when it was three feet deep on the floor of his store, and was running over the counters.

Mart Overton testified for plaintiff that the water was about three feet higher than it ever was before for 20 years; that he had noticed that, when the water "comes" over the Burlington grade, it begins to go down at "our" place; has been that way for 20 years. Other witnesses for the plaintiff testified that there was a deep, wide basin on the west side of the Burlington grade; that a pretty fair current was running from the southwest to the north of east, and that the water always broke over the grade in flood times.

Henry Wurster testified that, at about half past 8 o'clock on the morning of July 6, the water commenced to run over the J street grade; that before that time it was from three to four feet lower on the north side of the grade than it was on the south side, and that in about 15 minutes after it broke over the grade it was the same height on both sides. To the same effect was the testimony of Helzer, Lendtke, and Schmall. One Siebert testified that the water came over the J street grade between 8 and 9 o'clock. In fact, the plaintiff clearly proved by a number of witnesses that the water coming down Salt creek from the south was held back for a short time by what is called the Denver grade, and did not break over the grade until between 8 and 9 o'clock in the morning. The testimony of surveyor Scott fixes the elevations along the J street grade, and for a short distance north and south thereof; the elevations of the grades and the openings or waterways constructed therein, together with the

highway bridges across Salt creek, and the railroad bridge on or near J street. The size of the openings of the waterways thereunder were described by him, and it may be said that his evidence corresponds with the grades and elevations as fixed by the defendant's engineers.

The evidence introduced on the part of the defendant shows that the city of Lincoln is constructed on the east side of Salt creek valley, but a portion of it lies within the Salt creek basin. The source of Salt creek is near the southwest corner of Lancaster county, about 23 miles from Lincoln, at an elevation of 1,500 feet above sea level. This stream flows in a northerly direction through Lancaster county, and, as it enters the corporate limits of the city of Lincoln, it passes through the basin that receives the flood waters from a drainage area of approximately 680 square miles. This drainage area is fan-shaped in form, and converges into Salt creek basin at the western edge of the city of Lincoln. The Burlington railroad built its first line into and through the city in 1870. Subsequently other lines were purchased or constructed, so that in 1908 the defendant owned a number of railway lines converging into the city of Lincoln, with the terminals essential for its use. The main line of the Burlington from Chicago to Denver, extending southwestward from the passenger station through and beyond the city of Lincoln, crosses Salt creek at a point where B street would intersect the railway if it were extended westward. This line of railway is referred to in the record generally as the Denver line. The plaintiff's property is located at Fifth and D streets, about five blocks east of the Denver line. In 1908 the defendant company had about completed its Middle creek yards, and railway lines connecting those yards with the Denver line, and the switch tracks to the west thereof. The yards are about 3½ miles long, and from 200 to 1,000 feet wide. The railways connecting these yards with the main lines are laid upon an elevation of earth approximately eight feet in height. Salt creek is spanned by a bridge 250 feet in length, divided into waterways by piers constructed to carry the rail-

ways from the main line into the yards. This improvement is referred to in the evidence of both plaintiff and the defendant as the new construction, the J street embankment, and the J street grade. A map was introduced in evidence by the plaintiff, from which may be ascertained the high water plane by a dotted irregular line in the form of letters H W to indicate the elevation the water attained at each particular point. The Denver embankment is from four to five feet in height, but the elevation of the ground upon which this track is laid makes the top of the ties on this line as high as the top of the ties on the J street embankment. The plaintiff's property is situated a trifle over half a mile south and up stream from the J street grade, and the Denver line intervenes between plaintiff's property and the J street embankment.

On July 5, and the morning of July 6, 1908, the drainage area of upper Salt creek, of Oak creek, Middle creek, Antelope creek, Little Salt creek and Stevens creek was deluged by a heavy rain, which, as we view the testimony, was unprecedented in volume and extent; 5.13 inches of rain fell during that night upon the campus of the University of Nebraska near the Salt creek basin. Approximately the same amount of rain fell over the entire drainage district above mentioned. The conditions existing in the valleys of the watercourses flowing into Salt creek basin are described by numerous witnesses. Haines branch, which empties into Salt creek near Lincoln Park, some distance south of the plaintiff's premises, was out of its banks at 6 o'clock on the morning of July 6, and the water was from 2 to 6 feet deep on the bottoms, which were about 80 rods wide.

Frank Denton, Thomes Littler, and Martin Gilbert testified that no other flood of such magnitude was known to have existed since 1866. Antelope creek, which flows east through Lincoln, and from thence into Salt creek near the fair grounds, was out of its banks by midnight of July 5. The water was the highest at about 3 o'clock in the morning of the 6th of July, and remained at flood tide until 4 o'clock. The water in the Antelope valley

flowed 3½ feet deep down the Rock Island tracks and across O street in the city of Lincoln. North of O street the stream was 200 feet wide, and in some places from 10 to 12 feet deep. In the upper Salt creek valley, at Roca, which is several miles south of Lincoln, the water was 2 feet higher than it had been known to be in the preceding 40 years. Stevens creek, which empties into Salt creek about 7 miles northeast of Lincoln, and not far from Havelock, was out of its banks at 5 o'clock in the morning, and was higher than it had been known to be for 40 years. The water in Salt creek attained such a height that it held back the waters in Stevens creek, which at its maximum height was some 2 miles wide. In some places the water was 6 feet deep, and it destroyed three-fourths of a mile of the Burlington grade near Havelock, and did not commence to recede until 4 o'clock in the afternoon. Little Salt creek, which empties into main Salt creek below the mouth of Antelope creek, but above the confluence of Stevens creek and Salt creek, was also out of its banks and covered the bottoms, which were about a mile and a half wide. The water from Salt creek backed up the water in Little Salt creek, and it was three days before it receded within its banks. The water was from 10 to 12 feet deep on the bottoms, and came up so suddenly that a boy driving cattle was marooned upon a knoll, and was rescued by means of a raft. In Oak creek valley the water was 1 mile wide and 3 feet deep, with a current so swift that it destroyed about 80 or 90 yards of the Union Pacific railroad grade. Between Havelock and Waverly the water in the Salt creek valley was 6 feet deep in the bottoms, and from 2½ to 3 miles wide. At 4 o'clock in the morning the water was backing upstream from Little Salt creek in the neighborhood of the mouth of Antelope creek, and by 11 o'clock in the forenoon there was 5 feet of water in the pasture just below the mouth of the Antelope. By 10 o'clock in the forenoon of July 6, all of the railway embankments in the Salt creek valley in Lincoln and vicinity were entirely submerged. At 8 o'clock in the forenoon of July 6, 1908, at the corner of Second and

L streets nearly three blocks north of the J street grade, and about three-fourths of a mile down the stream from the plaintiff's premises, the water was flowing up stream. Horses were drowned in the vicinity of the gas works, just north of J street, and, according to the testimony of plaintiff's witness Wurm, the water attained its greatest elevation between 1 and 2 o'clock in the afternoon, and continued at that elevation for three hours thereafter. According to the testimony of plaintiff's witness Reif, the water did not commence to recede until 12 o'clock P. M. of July 6. Plaintiff's witness Phillips says the water remained at its maximum height for three hours, and that the water flowed over the J street bridge from 4 o'clock P. M. until dark. It appears that for three hours the water was without much current and was like a pond. Plaintiff's witness Scott established the elevation of the flood plain at three points north of and down the stream from all of the defendant's alleged negligently constructed improvements, and from an examination of those elevations every principle of hydraulics would be violated by saying that the defendant's embankments increased the elevation of the water south of those points. The plaintiff's property is more than 3,500 feet northward from the northwest corner of block 79, and the water at that point below the defendant's embankment was within 2.27 feet of the top of the counter in plaintiff's store. Plaintiff's witness Scott testified that there is 3.3 feet fall in the natural surface of the ground between defendant's J street grade and the Denver line bridge over Salt creek. The distance between those structures is less than the distance between the northwest corner of block 79 and the plaintiff's store. Allowing for the natural fall of the surface of the ground, the hydraulic or flood grade between the plaintiff's property and the northwest corner of block 79, at the time the water attained its maximum height, was less than the natural grade of the ground. In fact, it is clearly established by all of the testimony, and that fact is disputed by none, that the water

95 Neb. 33

flowed into Salt creek basin from the various streams trib-
utary thereto until it filled that basin and submerged all
of the defendant's railway tracks, grades and construction
several feet in depth, and there was a lake or pond in the
valley sufficiently high to create a head which forced its
way down the stream and through the constricted outlet
in the vicinity of Havelock; that for three or four hours
this solid body of water overflowed the whole bottom,
and remained in the plaintiff's store as high as the top of
his counters.

It thus clearly appears that plaintiff's real estate and
personal property would have been damaged to the same
extent by the flood waters of July 6, 1908, if the defend-
ant's embankments had not been constructed in the Salt
creek valley. It is true that, for a short time on the morn-
ing of July 6, the water coming from the south down the
Salt creek valley was held back to some extent by the
Denver grade, and flooded the plaintiff's store. But, as
soon as the volume of water from the other tributaries
poured into the basin, it became filled up, and a great lake
was formed in the area between Havelock and A street,
and the water continued to rise until a sufficient head
was created to carry it north down the Salt creek valley;
that during that period the flood in the plaintiff's store
reached its maximum height, and there remained for sev-
eral hours at the same height as the flood plane through-
out the whole basin.

Plaintiff, by his petition, failed to allege special dam-
ages for that part of the time in which his premises were
flooded before the water broke over the defendant's grade.
No proof was introduced on that point, and the cause
was not tried on that theory. Therefore, it was the plain
duty of the trial court to sustain defendant's motion and
direct a verdict in its favor, and it was reversible error
to overrule that motion.

It is also contended that the court erred in overruling
defendant's motion for a change of venue. That motion
was supported by the affidavits of 113 persons. Among
them appears the affidavit of Gottfreid Herzog, who testi-

fied that he was well acquainted with the locality where the flood claims against the defendant originated; that 400 property owners in the Salt creek basin, in a territory covering 60 blocks in the city of Lincoln, were claimants against the railroad company for damages; that meetings were regularly held on the last Tuesday of each month attended by many of those claimants; that in those meetings the question of the defendant's liability was discussed, and the property owners agreed to testify for each other. A written memoranda was made as to what each claimant would testify to; that the meetings were regularly organized, with a presiding chairman, and the claimants would laugh, and say they would enforce their claims and secure settlements, although they did not believe the company was liable; that the attorneys and agents for the claimants were urging litigation, and advancing the arguments that juries in Lancaster county would find for the claimants, that the railroad company could not win, that the claimants and property owners had many friends and relatives residing in different parts of Lancaster county, and that defendant could not obtain a fair and impartial trial in said county. Many other affidavits of the same nature were produced, together with the affidavits of other persons long residents of Lancaster county, residing in different precincts, villages and cities, and from practically every walk of life, stating that defendant could not obtain a fair and impartial trial in the county. In opposition to the motion, the plaintiff produced the affidavits of about 250 persons who testified that, in tl ir judgment, the defendant could have a fair and impartial trial in Lancaster county. Out of this number, 60 of the affiants resided in University Place, where one of the leading counsel for plaintiffs in the flood cases resided. Practically every lawyer in Lancaster county who held a claim of the character referred to in Mr. Herzog's affidavit made an affidavit to the effect that defendant could have a fair and impartial trial in the county.

After a careful reading of the affidavits, and an examination of the record, we are satisfied that the district

court erred in not granting the defendant a change of venue; and our conclusion is confirmed by the special verdicts of the jury in which they found that plaintiff's real estate described in his petition would not have been damaged to any extent by the flood waters of July 6, 1908, had the defendant's embankment not been constructed in the Salt creek valley, and that the personal property described in plaintiff's petition would not have been damaged to any extent by the flood waters of July 6, 1908, had the defendant's embankment not have been constructed in Salt creek valley.

As we view the record, those findings were in direct opposition to the evidence, and, in fact, there was no evidence to sustain them. . While the special findings of a jury under ordinary circumstances are entitled to great weight and careful consideration, and will not be lightly set aside, still where they are opposed to all of the evidence they are entitled to no consideration whatever. Those findings should have been set aside and a new trial awarded.

The defendant has assigned many other errors as grounds for a reversal of the judgment, among which it is claimed that it was error for the court to receive the plaintiff's evidence relating to the drowning of persons in the flood in question; also, that it was error for the district court to receive evidence relating to the destruction of the domestic animals found at or near the J street bridge. It seems clear that it was error to receive this evidence; but it is unnecessary, as we view the record, to discuss those assignments, for it is clear that the evidence does not sustain the verdict, and the court erred in not granting the defendant a change of venue.

For the reasons above mentioned, the judgment of the district court is reversed and the cause is remanded for further proceedings.

REVERSED.

REESE, C. J., dissents.

ROSE, J., took no part in the opinion.