WILLIAM BOYD, JR., APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPELLANT.

FILED DECEMBER 4, 1914. No. 17,800.

1. **Change of Venue.** "An application for a change of venue in a civil action should be denied, unless it is made to appear to the court that a fair and impartial trial cannot be had in the county where the action is pending; the fact that there are numerous persons in the county that are biased and prejudiced against a party to a suit will not justify a court in granting a change of venue, on the application of such party, if it appears that a fair and impartial jury can be had, and a fair trial had therein." *Northeastern N. R. Co. v. Frazier*, 25 Neb. 42.

2. ———: APPEAL: DISCRETION OF COURT. "Unless an abuse of discretion is shown, this court will not disturb the ruling of the lower court upon a motion for a change of venue." *Hinton v. Atchison & N. R. Co.*, 83 Neb. 835.

3. ———: ———: ———. "In passing on a motion for a change of venue the district court is vested with a sound legal discretion, and his ruling thereon will not be disturbed unless it appears that he has been guilty of an abuse of such discretion." *Smith v. Coon*, 89 Neb. 776.

4. **Trial:** QUESTIONS FOR JURY: DIRECTING VERDICT. In jury trials all questions of fact upon conflicting and material evidence must be submitted to and decided by the trial jury. In such case, the trial court has no authority to withdraw such evidence from the jury and direct the return of a verdict in favor of either party.

5. **Case Distinguished.** This case distinguished from *Albers v. Chicago, B. & Q. R. Co.*, 95 Neb. 506.

6. **Instructions** given and refused are examined, and no error requiring a reversal of the judgment is found.

APPEAL from the district court for Lancaster county: ALBERT J. CORNISH, JUDGE. *Affirmed.*

*Byron Clark, Jesse L. Root, Strode & Beghtol* and *Barton L. Green,* for appellant.

*A. G. Wolfenbarger* and *George W. Berge, contra.*

Reese, C. J.

This is an action to recover damages alleged to have been sustained by the destruction of growing crops in the Middle creek valley on August 29, 1910, by reason of the same having been flooded with high water by which, it is alleged, plaintiff's crops were destroyed. It is alleged and contended by plaintiff that the proximate cause of the flooded condition of plaintiff's land and crops was the faulty construction of certain embankments thrown up by defendant in the building of its track yards in said valley, which changed the flow of the surface water in flood times from its former habit of spreading out over the valley to and confining it to the south side of said embankments, thereby greatly increasing the flow upon that side to the extent of overflowing plaintiff's land, which is upon the south side, and destroying his crops thereon, as aforesaid. The amount claimed in the petition was $1,000. A jury trial was had, which resulted in a verdict in favor of plaintiff for the sum of $500. A motion for a new trial was filed and overruled, when judgment was entered upon the verdict. Defendant appeals.

The first question for consideration is the ruling of the district court on a motion for a change of venue filed by defendant in the case of William Albers against this defendant, *Albers v. Chicago, B. & Q. R. Co.*, 95 Neb. 506, but which by stipulation of the parties was considered on the hearing of this case. As shown by the opinion in the *Albers* case, the motion was supported by the affidavits of 113 persons, and opposed by the affidavits of 250 persons. It is stated in plaintiff's brief that there were about 140 affidavits supporting the change and 245 affidavits in opposition thereto. Whether the affidavits presented on the hearing in this case are the same in number as in that case we have no means of knowing, except as is furnished by the stipulation and the acts of the parties, but we will assume that they are substantially the same, some additional affidavits having, probably, been filed after the hearing of the *Albers* case. It is said in defendant's brief that "the showing made by the defendant and by the respective

plaintiffs in all of the cases is identical." It is quite prob-
able that this is substantially correct, although the num-
ber of affidavits filed by defendant was 113, instead of 140
as stated by plaintiff.  Upon the first consideration of this
part of the case, we were strongly inclined to adopt de-
fendant's view that "the instant case, therefore, is ruled
by the decision in the cited case (*Albers v. Chicago, B. &
Q. R. Co.,* 95 Neb. 506), and the appellant's right to a
judgment of reversal, with a direction to grant a change
of venue, is absolute."  But, upon reflection, and in view
of the apparent confusion as to the affidavits, and the fur-
ther fact that that case was not connected with this one,
the parties plaintiff being different persons, the property
in dispute being entirely different, and the averments and
evidence referring to different property, one separated from
the other a considerable distance and upon a different
stream, and the alleged construction of defendant's im-
provements being different from that attacked in the *Al-
bers* case, and the further fact that the damage alleged
in this case is said to arise from an overflow in 1910, and
in that case in 1908, we have concluded that the question
requires an independent investigation, but not forgetting
to give due and respectful consideration to the holding in
that case, by a majority of the court, to the effect that
there was an abuse of discretion on the part of the district
court in overruling the defendant's motion for a change
of venue in that case.

In defendant's brief much stress is placed upon the
affidavit of one Gottfreid Herzog.  We have examined his
affidavit with care for the purpose of determining the
weight to which it is entitled upon this question in this
case.  The affidavit is quite long, and cannot be set out
here in full.  It is largely composed of the conclusions of
the affiant, instead of the statements of fact within his
knowledge, and of matters which do not throw any light
upon the views of the people of Lancaster county with ref-
erence to this particular suit.  He says that continuously
since the flood of July, 1908, it has been the topic of con-
versation among those owners, friends and lawyers in the

city of Lincoln and county of Lancaster, and affiant has repeatedly heard conversations between the owners and claimants when they were alone and also when their attorneys or agents were present, and it was a matter of frequent comment and argument that juries of the county would find for the claimants and that the railway company could not win; that meetings have been held in said neighborhoods by numbers of said owners, aggregating as many as 200 at one time and other times 75 or 50, and in those meetings the question of defendant's liability was discussed, and property owners would agree to testify for each other in their claims for damages and suits, and written memoranda would be made as to what each one would testify to for the other, and those meetings are regularly held upon the last Tuesday of each month, and sometimes special meetings are called at other dates; that affiant is informed that at one meeting a lawyer was present and talked to the claimants and told them why they should commence suits; that he does not remember the name of the lawyer, but heard several property owners discuss the matter afterward; that the 400 owners having claims in the salt basin are scattered over a territory covering 60 blocks in the city of Lincoln and its additions; that at the time of the flood affiant read descriptions in the newspapers published in Lincoln detailing the flood and the loss of property and life and the accompanying exciting events; that affiant was a witness in one of the cases tried. A consideration of this part of the affidavit must satisfy any fair-minded person that, if true, it could have no possible bearing upon the question of the mental attitude of the public in Lancaster county so far as this particular case is concerned, for it must be observed that practically all he says has reference to the flood in 1908, two years before plaintiff's alleged cause of action arose, and with reference to conditions in the salt basin, far removed from plaintiff's land. That there was a disastrous flood in the salt basin in 1908 all admit. As bearing upon the matter of bias and prejudice in the minds of the people of the county,

he says that he is well acquainted with men living in the county outside of the city of Lincoln, and has heard 10 or 15 different parties say that they thought that the railroad company should pay and ought to pay the claims for damages, referring to the salt basin flood of 1908; that from numerous conversations he has heard between different men, both in the city of Lincoln and out over the county, there is a general prevailing prejudice against the railroad company on account of the flood damages, and that he does not believe that the railroad company can have a fair and impartial trial before an unprejudiced jury in Lancaster county. Other parts of the affidavit are of like tenor. He closes the affidavit by saying that "he has no personal interest in the subject matter at this time, nor has he had any such personal interest since about four months ago," which is at least suggestive, but this has no reference as to the case now in hand. He gives his business as that of a carpenter, his age 44 years, that he has resided in Lincoln about seven years, and now resides on what is known as the "salt basin," where he has resided for six years. Even were the subject of the meetings of the complainants a material matter upon the question of the change of venue in the *Albers* case, he gives no hint that he attended or was present at any of them. An unusual feature of his action in this case is shown by the affidavit of one Weingarten, who testifies that he presented to Herzog an affidavit for signature that 26 persons who made affidavits in resistance to the motion for the change of venue were interested in claims growing out of the flood of 1908, a part of which had sued and others threatening suit, when he declined to sign the affidavit "for fear they would kill him." Without further attention to the affidavit of this person, we are persuaded that the district court rightfully cast it aside, having little, if any, application to this case, and as of no probative value therein. It is no evidence of local bias or prejudice in this case that the parties having similar causes of action, based upon facts entirely different from this case, should meet and confer together in their preparation for trial.

Many affidavits were filed descriptive of the floods of 1907-1908 in the salt basin, and some of that of 1910, showing the curiosity of the people of Lincoln, to the extent that the viaduct and shore of the water were thronged with people observing the same, in the salt basin; but there is a dearth of proof that there was any excitement or prejudice expressed against defendant with reference to this case. It is true that practically all of the 113 affidavits filed by defendant contain the statement of bias and prejudice, and the belief of the affiants as to the minds of the people of the county, and that defendant could not obtain a fair and impartial trial in the cases referred to therein; but much of the contents of those affidavits was not material upon the question of the proposed change of venue in this case. It may be possible that, taken alone and uncontradicted, there was sufficient to justify a change of the place of trial in this case; but when we consider the affidavits presented by plaintiff, bearing upon this case, in which many of the assertions of those presented by defendant were contradicted, we are well convinced that the case appealed to the judgment and discretion of the district court, and we cannot say that there was an abuse of that discretion in overruling this motion. If there is not an abuse of discretion, the order of the district court overruling the motion must be affirmed. The order overruling the motion was "without prejudice to a second application, provided, it should hereafter appear from trial in other actions or otherwise that defendant cannot have a fair trial in this county," to which defendant excepted; but we find no renewal of the motion in the transcript or bill of exceptions, except that before the jury were impaneled the defendant resubmitted to the court the former motion, which was overruled, no new facts or evidence being introduced.

In *Northeastern N. R. Co. v. Frazier,* 25 Neb. 42, we said in the syllabus: "An application for a change of venue in a civil case should be denied, unless it is made to appear to the court that a fair and impartial trial cannot be had in the county where the action is pending; the fact

that there are numerous persons in the county that are biased and prejudiced against a party to a suit will not justify a court in granting a change of venue, on the application of such party, if it appears that a fair and impartial jury can be had, and a fair trial had therein." In the body of the opinion we said: "In civil cases it is rare that the people of a whole county become biased and prejudiced against a party to an action. The reason is, they ordinarily take but little interest in the controversy, hence have no feeling in the case. There is a marked difference in this respect between a civil and criminal case, particularly where the offense charged is an atrocious one. * * * A plaintiff properly bringing an action in a county in which he resides is entitled to have the cause tried in such county, unless it is clear that a fair and impartial trial cannot be had therein."

In *Hinton v. Atchison & N. R. Co.*, 83 Neb. 835, we held: "Unless an abuse of discretion is shown, this court will not disturb the ruling of the lower court upon a motion for a change of venue."

In *Smith v. Coon*, 89 Neb. 776, it was held in the syllabus: "In passing on a motion for a change of venue the district court is vested with a sound legal discretion, and his ruling thereon will not be disturbed unless it appears that he has been guilty of an abuse of such discretion." In the body of the opinion it is said: "It has been frequently held, where this question has been fairly submitted to and determined by the trial court, that, unless it clearly appears that there has been an abuse of discretion in refusing to grant a change of venue, the ruling of that court will not be disturbed. From a careful examination of the record in this case, we are of opinion that the order of the district court in refusing to grant a change of venue was the proper one. Finally, it appears that defendant had a fair and impartial trial; that his contentions were fully considered, and his matters of defense were submitted to the jury under proper instructions; that the evidence is amply sufficient to sustain the verdict; and the judgment of the district court is therefore affirmed."

The rule applicable to motions for change of venue is as strictly held in this state in criminal cases. *Jahnke v. State,* 68 Neb. 154; *Goldsberry v. State,* 66 Neb. 312; *Simmerman v. State,* 16 Neb. 615; *Sweet v. State,* 75 Neb. 263; *Taylor v. State,* 86 Neb. 795.

After a careful examination of the affidavits applicable to this case, submitted to the trial court, we are unable to detect any abuse of discretion on the part of the court in this case in overruling the motion under consideration.

Quoting from appellant's brief: "The instant case is one involving a charge of negligent construction in elevating the natural surface over a considerable area on the north side of Middle creek, by depositing earth, raising embankments, and constructing railway tracks thereon. No openings were made in this grade, which is from 200 to 1,000 feet in width and 3½ miles in length."

As bearing to some extent upon the question of the bias and prejudice of the jurors, we have examined the evidence as to the amount of plaintiff's loss, and find that the lowest average estimate of the witnesses exceeded the amount sued for. The verdict, being for $500, does not show any bias or prejudice on the part of the jury, and, so far as that feature of the case is concerned, defendant cannot claim that it did not "have a fair and impartial trial."

At the close of plaintiff's evidence, defendant moved the court for a peremptory instruction to the jury to return a verdict in favor of defendant. The motion was overruled, to which exception was taken. Again, after all the evidence was taken, the motion was renewed and overruled, with a like exception. Both rulings are now assigned for error. This requires a consideration of the evidence. The land upon which plaintiff's crops were growing is situated in the valley of Middle creek, principally on the south side of the creek bed. When in a state of nature the bed of the stream was quite crooked, and, except at times of unusually high water and floods, carried the stream within its banks. On occasion of excessive floods the water spread out more or less over the entire valley. The general direction of the stream is nearly east and west, its waters emptying into

Salt creek, which runs from south to north through the western part of the city of Lincoln, the streams meeting at nearly right angles, except that near the mouth of Middle creek its channel turned toward the northeast and its waters emptied into Salt creek farther down the stream within the city. A line of defendant's railroad was constructed within and along the Middle creek valley on the north side of the stream. In the years 1906, 1907, 1908, defendant constructed a system of car tracks along the north side of the stream, cutting it in places, filling up the bed, and making new channels along the south side of its tracks. The embankment upon which the tracks were placed was from 200 to 1,000 feet in width and 3½ miles in length, and located practically in the center of the valley. The land upon which plaintiff's crops grew is situated on the south side of this embankment, and it is alleged that by its construction the flood waters, which had formerly spread out over the whole width of the valley, were turned to and confined on the south side of the structure, and were thus forced onto and over plaintiff's crops, and by which they were largely destroyed. It is conceded that no openings were left in this whole embankment, and that when the flood waters were upon the south side thereof there was no escape therefrom but by passing down the whole distance to and through a newly cut channel into Salt creek just above a bridge across that stream, the new channel entering that creek at about right angles with its bed. It is contended by plaintiff, and testified to, that prior to the construction of the embankment when the stream was flooded and overflowed the water spread out over the whole width of the valley at small depth, and that by its escape into Salt creek valley to the northeast, as well as being held by certain depressions or ponds, the injury to the growing crops was not so serious, only a small part of the land being overflowed, but that by being confined and held upon the south side of the embankment its depth was greatly increased and the crops submerged and destroyed, and that at the time the crops were being destroyed in 1910 there was no water on the north side of the embank-

ment, except what was carried by the drainage from the hills and ravines on the north. . Upon this there was a conflict in the evidence, as some testified that at the time of the flood in question there was a large body of water on the north side, and also that in the earlier times and before the construction of the embankment more water was on the south side of the creek, when floods came, than upon the north side. This conflict was submitted to the jury. There was sufficient to sustain the contention of plaintiff, if believed by the jury, and therefore their finding on that part of the case must be accepted as final. It is also true that the question of the negligent construction of the embankment, the changing of the channel of the stream, the impounding of the water, confining it to the south side of the valley, if it was so confined, the failure to make openings through the embankment for so long a distance and thus allowing the flood water to escape to the northeast, but preventing the same, as claimed by plaintiff, if the former floods did so escape, would necessarily require the decision of the questions of defendant's negligence by the jury. There is no contention that plaintiff's crops, some of which were practically matured, were not injured and a large part thereof totally destroyed by the flood waters. Neither is there any contention that, if defendant is liable at all, the verdict is excessive. The refusal of the trial court to direct the jury to return a verdict in favor of defendant is strongly urged by counsel for defendant as being erroneous. When we consider the whole case, with conflicts in the evidence, we are persuaded that the court did not err in declining to give the peremptory instruction to the jury directing a verdict in favor of defendant. In effect it would have been the withdrawal of all contested material facts from consideration by the jury, and the assumption of a decision thereon by the court, which, under our system of judicial practice, can never be allowed.

It is contended that "the court erred in refusing to permit the defendant to prove, on the plaintiff's cross-examination and that of his witness Harris, that in 1909 and

1910 the conditions in Middle creek valley were such that the plaintiff should have in reason anticipated a flood of the character he encountered in 1910." The argument is that the improvements made by defendant are permanent in their character; that they were not unnecessary when considered from a railroad standpoint, or that from an engineering standpoint they could have been constructed other than they were and at the same time provide a safe way for the use of the railroad company and its patrons; and it is claimed that under the rule stated in *Harris v. Lincoln & N. W. R. Co.*, 91 Neb. 755, defendant could not be held liable for the subsequent destruction of crops because the existence of the railway embankments deflected the flood waters over and upon the premises; that defendant was entitled to prove by plaintiff on his cross-examination that he knew before planting his crops that they were liable to be destroyed by high water; that, if plaintiff is entitled to recover at all, his measure of damages would be "the difference between the rental value of the property with the defendant's improvements in the shape they are in and its value if no such improvements existed. In other words, the plaintiff cannot gamble upon the chance he takes by renting the land at a depreciated rental so that he will profit largely should the floods not come, and, on the other hand, attempt to hold the railroad company for the damage such floods will work in the event they appear." The case of *Willitts v. Chicago, B. & K. C. R. Co.*, 88 Ia. 281, is cited in supporting this contention. In that case it was stated that, if "it was fully evident to the plaintiff at any time that it was useless to plant any crop * * * because it was certain to be flooded and destroyed," then the value of the crop was not an element in estimating damages. This might be the correct rule when it is *plainly useless* to plant the crop *"certain to be flooded and destroyed,"* but that is not the case in hand. Other crops had been raised upon this land, and there was no *certainty* that such a flood might ever return. No one can say that it is "certain" that such a flood will return during this or any subsequent year. Such a ques-

tion would be beyond the power of any finite mind to determine. Should an action be brought for "rental value" and it appear that there was no flood, as will probably often be the case, the defense that, had plaintiff planted and cultivated his crop, he could not recover, would have to be sustained. If the oft-repeated rules that one must so use his property as to inflict as little damage upon his neighbor as may be, and that the neighbor should so utilize his own as to reduce the injury, are to be applied, the contention on this part of the case cannot avail. In this view the court did not err in refusing to give the ninth instruction asked by defendant that, "if the plaintiff *knew* before he leased the land" that it would be overflowed, so as to destroy the crop, he could not recover. It must be sufficient to say that there was no proof that he "knew," nor could any one know what the future might produce.

Other criticisms are made upon the action of the court in refusing to give, as well as in giving, instructions, but we are persuaded that so far as the instructions go, whether given or refused, the case was fairly submitted to the jury, and we can discover no prejudicial errors occurring during the trial.

The judgment of the district court is therefore

AFFIRMED.

ROSE and FAWCETT, JJ., not sitting.

SEDGWICK, J., dissenting.

If this action was pending when the circumstances stated in Herzog's affidavit occurred, and parties interested in this case were present at the conferences therein described, I think the opinion in this case does not satisfactorily distinguish between this case and the *Albers* case on the question of change of venue. If the land in question in this case adjoins the land mentioned in *Harris v. Lincoln & N. W. R. Co.*, 91 Neb. 755, and is no higher, I think that this opinion does not satisfactorily distinguish between this case and the *Harris* case on the question of defendant's liability. For these reasons, I do not concur in this opinion.